## Case No. 8,168.

### In re LEAVITT.

[Cited in Re Pratt, Case No. 11,370. Nowhere reported; opinion not now accessible.]

---

## Case No. 8,169.

### In re LEAVITT.

#### [1 Hask. 194.] [1]

District Court, D. Maine. Feb.. 1869.

BANKRUPTCY — FRAUDULENT PREFERENCE — DISCHARGE—CO-PARTNERSHIP CREDITORS.

1. A fraudulent preference, given by one member of a co-partnership without the knowledge, authority, or consent of his co-partner, does not debar the latter of his discharge in bankruptcy.

2. A discharge should be denied a bankrupt for fraud, when shortly before his bankruptcy, being insolvent, and possessed of a note against his father, he took animals, exempt from attachment under the state laws, in part payment of the same, and then sold the note to a brother-in-law, and took other animals also exempt from attachment in part payment for the note.

3. Co-partnership creditors are entitled to the individual assets of one co-partner, who has no individual creditors, and may oppose his discharge.

In bankruptcy. Petition for discharge, both from individual debts, and debts of the firm of Nye & Leavitt, in which the bankrupt [Albert Leavitt] was a partner. Sundry creditors objected, because the bankrupt had fraudulently preferred one creditor, and had fraudulently conveyed away property to prevent its distribution in bankruptcy.

Hiram Knowlton, for petitioner.

William L. Putnam, for creditors.

FOX, District Judge. It appears that the firm carried on two stores, one at Skowhegan conducted by Nye, and one at Athens, about ten miles from Skowhegan, under the management of Leavitt. Leavitt was also engaged in operating a mill at Athens, and he does not appear to have had much to do with the partnership affairs at Skowhegan, where the largest amount of stock was kept and the most of the business transacted. They failed in Jan., 1868, and after attempting to effect a settlement with their creditors without success, they filed their petitions in bankruptcy on the 2d day of March.

The first objection charges a fraudulent preference by a payment, on the 2d of March, of $300 to the Second National Bank of Skowhegan on a firm note. The facts respecting this payment are disclosed by Nye, the other partner. He testifies, that having sold goods from the store at Skowhegan on the 2d of March, just prior to going to Augusta to prepare his petition in bankruptcy, he, Nye, paid $300 part proceeds of the sales to the bank, in part satisfaction of an overdue company note for $500. This payment Nye testifies was made by him, with-

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

out the knowledge or assent of Leavitt, or his having any reason to suppose that it would be made. Nye met Leavitt the same forenoon at Augusta, by appointment, and their separate petitions in bankruptcy were prepared by the same counsel on that day at Augusta, and were then and there sworn to by the bankrupts. Nye's petition stated the amount due to the Second National Bank as $300, through an error of counsel, as it is now said, there being in fact only $200 due the bank, and this statement was so copied onto the schedules of their liabilities annexed to Leavitt's petition.

There can be no doubt that this payment, as now presented, was a fraudulent performance on the part of Nye, which unless explained would deprive him of his discharge; and it is claimed that Leavitt, the co-partner, is accountable for all transactions of Nye in behalf of the firm, and must suffer the like consequences as his partner for the fraudulent acts of his partner. In the aspect of this case as presented, I do not think this result must necessarily follow. Whilst one partner is ordinarily bound by, and responsible for, the doings of his co-partner in behalf of the firm, this principle should not be extended to the fraudulent misconduct of a partner, and render a partner criminally amenable for his co-partner's wrongful conduct, in which he was not personally a participant. A preference or payment, in violation of the provisions of the bankrupt act [of 1867 (14 Stat. 517)], is by the act constituted and declared to be a fraud, and the most serious consequences result from its commission. Each partner ought to be held personally accountable and amenable to its provisions for his own fraudulent misconduct; but I do not think that it was ever the purpose of the framers of this act to punish an innocent partner, by a refusal of his discharge, for a fraudulent preference given by his co-partner without his knowledge, authority, or consent. It is a personal penalty, to which each party is to be made subject only for his own acts and deeds.

If Nye is believed, and there is nothing in contradiction of his testimony, Leavitt was not a party to this payment, knew nothing of it, and the money so paid was realized from the sales of the Skowhegan stock by Nye alone. without any evidence before me, that Leavitt was informed that these goods had been sold, or that Nye was in possession, from any source, of any funds of the co-partnership.

It may be said that the schedule of liabilities subscribed and sworn to by Leavitt, on the day of this payment, shows that he must have then been aware of it. It does show that the demand of the bank was stated at only $300, but it nowhere appears that Leavitt was aware that this note was originally for any larger amount. or that any payment had been made upon it, and especially that any payment had been made that day by Nye.

If it had appeared that Leavitt was, at the time of preparing his petition, aware of this payment, as at present advised, I should not, on this account, have been inclined to refuse him his discharge, unless it had also appeared that he had participated in, or originally authorized the payment to be made, and for the reason, that at the time of making his petition the fraud had been committed, the provisions of the law were already violated, the wrong and fraud had been completed and accomplished, not by Leavitt, but by Nye, without Leavitt's knowledge, direction or authority, at the time it was done. He not being an actor, not having taken any part at the time in aid of the guilty conduct of his co-partner, I do not think he should be punished so severely as to be deprived of his discharge, merely for the fact that after the fraud was committed, and he was informed of it, he verified by his oath and signature the schedules as copied by his counsel in his behalf, setting forth the balance only of the claim after deduction of the amount thus paid by his co-partner.

In my opinion, this fact should not, by and of itself, be deemed such a ratification of the fraud of his co-partner, as thereby to render him amenable to the like consequences, as if he had himself personally made the fraudulent payment. Such a view would be carrying the doctrine of ratification far beyond any case I have met with, and does not at present meet with my approval; but I am not required to determine absolutely this question, as the testimony does not satisfy me that Leavitt was actually aware of the payment at the time the schedules were verified by him.

The second specification charges that the bankrupt, "on or about the 15th day of Feb., 1868, was possessed of a note of about $600 against one Caleb Leavitt, and that in contemplation of bankruptcy, he did exchange and dispose of said note for certain articles of personal property, which were exempt from attachment, and for other property, for the purpose of preventing said note from coming into the hands of the assignee, or of being distributed under the bankrupt act in satisfaction of his debts."

It appears, principally from the bankrupt's disclosure, that about the time of their failure, Caleb Leavitt, father of the bankrupt, was indebted to the firm to the amount of $174.54; that the bankrupt credited Caleb Leavitt's account on the firm books with this amount, and charged Caleb Leavitt on his private books the same amount, Caleb being then indebted to him for other transactions; that, as the bankrupt thinks, sometime in February, he received from Caleb Leavitt, in settlement of his account against him, his note on two years, for about $600, and afterwards, in part payment of the note, took from Caleb Leavitt a horse, cow, and ten sheep, for which he allowed him about $200. The balance of the note was sold by the bankrupt to his brother-in-law, Horatio C. Tobey, at a discount of twenty-five per cent., Tobey paying him, in the latter part of February, ten sheep, a hog and heifer, and the balance in money, as I infer, although it is not distinctly stated by the bankrupt in his disclosure. His excuse for selling the note at the time at so great a discount as given by him is, that "he had nothing to live upon."

By the 29th section of the act, a bankrupt is debarred of his discharge "if he has made any fraudulent payment, gift, transfer, conveyance or assignment of any part of his property, or has been guilty of any fraud whatever, contrary to the true intent of the act." By the 35th section, "if any person, being insolvent, or in contemplation of insolvency or bankruptcy, within six months before the filing of the petition by or against him, makes any payment, sale, etc., * * * or other disposition of any part of his property to any person who then has reasonable cause to believe him to be insolvent, with a view to prevent his property from coming to his assignee in bankruptcy, or to prevent the same from being distributed under this act, or to affect the object of, or in any way hinder, impede, impair or delay the operation and effect of, or to evade any of the provisions of this act, the sale, etc., * * * shall be void, and the assignee may recover the property or the value thereof as assets of the bankrupt," and if the same is not made "in the usual and ordinary course of business of the debtor, the fact should be prima facie evidence of fraud."

In my opinion, the dealings of the bankrupt, with this demand against his father were in fraud of the act, and not in the usual and ordinary course of business, but manifestly designed and intended to prevent the demand from coming to his assignee in bankruptcy. The entries on the bankrupt's account books, both day book and ledger, touching this transaction have been manifestly altered, and done with so great skill and adroitness, that it is now impossible either for the counsel or court to determine what the original entry was. The great care bestowed, in so completely concealing the terms of the original entry, is cogent proof that there was something worth while to conceal, and that it would not have proved very favorable to the bankrupt. He states, that he gave his father credit on Dec. 31st for the $174.54 on the company books; but I am not satisfied that the entry was made at that time; on the contrary, I believe it to have been made after the failure of the firm, and when it was well known to all their friends in that vicinity. The amount due the firm from Caleb Leavitt was a part of the assets of the partnership, and any arrangement made by the bankrupt to change the liability from the firm to himself, and make himself the creditor of his father, instead of the firm, after the firm was notoriously insolvent, with a further purpose and design to invest the amount in property ex-

empted from attachment under the laws of Maine, and for his future support, was a fraud on the firm creditors, and as I believe, clearly was so designed and intended by the bankrupt at the time. It has been decided that when partnership assets are not exempted from execution by the state laws, the bankrupt is not entitled to any portion of them.

The bankrupt states that the note given on settlement by his father was about $600. From the alterations on the account books, and certain entries which now appear, I am induced to believe it was for a larger sum, but be that as it may, he receives from his father various kinds of stock, all of which was ordinarily exempted under the state laws, and for which he allows his father, in part payment of the note, about $200. In the latter part of February, just previous to filing his petition in bankruptcy, he sells to his brother-in-law the balance of the note at twenty-five per cent. discount, and $100 of the amount is paid him in stock, likewise exempted, with the exception of ten sheep, which he claimed on his schedules annexed to his petition should be allowed to him under the provisions of the bankrupt act, as he could not hold them exempt under the state law.

The excuse he presents for selling the note at so large a discount is the length of time it had to run, and that "he had nothing to live on." It is true that the note was not payable for two years, but as it seems to me, this was a part of the plan and contrivance for defrauding the creditors of the demand. He was under no necessity of taking the note for that length of time, or in fact of taking any note; his father's rights were all protected if the account was left open and unadjusted, whilst the assignee could much more readily have converted the demand into money, if it had remained an open account liable to suit, if not paid on request. Again, if the bankrupt needed anything for the support of his family, he could have compelled his father, from time to time, to pay him according to his necessities, if he was indebted to him on account; but after he had accepted the note payable in two years, it was then wholly at his father's option to pay anything or not, as he should see fit. In the one case, by allowing matters to remain as they were, the bankrupt, if in need, could control his father, whilst in the other he was wholly powerless to compel his father to do anything for his relief before the note matured. It does not appear from any evidence that his father could not, at the time he gave the note, have paid the entire demand, if the bankrupt had seen fit to require it of him. His credit was certainly good, as his son was ready to trust him for two years for this large amount, increasing the liability by assuming to himself the amount due to the firm from his father.

The excuse that the avails from this note were necessary for the bankrupt's support, I deem equally untenable. The note was sold to Tobey the latter part of February, and the petition in bankruptcy was filed the 2d day of March; during this short period not a large amount could have been actually expended by the bankrupt in the support of his family, and not much was applied to procuring supplies in advance, as the amount of such on hand, as stated in his schedules, is only $40. It further appears that at this time he was in the possession of the remains of the Athens stock in trade, and there was also the stock at Skowhegan, from either of which, he could have obtained all that was necessary for his immediate wants. His examination shows that after Jan. 1st, he collected in cash $322.40 of Wood & Libby, a portion of which he paid on a note held against him by the bank, leaving in his hands more than $80, which he could have applied to his maintenance, and probably did, as he gives no further account of it, and which would have been all that was requisite previous to his petition in bankruptcy.

I am perfectly satisfied that there was no real necessity for his disposal of this note to Tobey, but on the contrary, it was wholly unjustifiable and without excuse, with no other motive or purpose that I can discover, than to appropriate to the bankrupt's own gain and advantage this entire claim, and deprive his creditors of all benefit from it.

That such was the fraudulent purpose and intent of the bankrupt is demonstrated by the course he pursued in converting three hundred dollars of this demand into stock, the larger portion of which would, as he supposed, become exempt under the laws of this state, and all that was not so exempt, he claimed in his petition and schedules should be exempted and allowed to him under other provisions of the bankrupt act. At this time, when he acquired this stock, he was deeply insolvent. Such kind of property he had never before thought it prudent or needful for him to become the owner of when in prosperous circumstances, but after his failure, when he was not the owner of a foot of land for their pasture or sustenance, he finds it necessary to invest $300 in sheep, a cow, horse, yearling heifer, and hog, proving as I think most conclusively, that he designed as far forth as it was possible, to prevent its distribution under the bankrupt law, and its coming to his assignee for his creditors' benefit. His failure was notorious, and I can entertain no doubt, was then well known to his father and Tobey, and that they were also well aware of the purpose and design of their relative in so disposing of his property. His dealing with this demand was certainly not in the usual and ordinary course of business, and is therefore prima facie evidence of fraud.

It is argued, that these proceedings were not in contemplation of bankruptcy, as the firm was endeavoring to effect a compromise with its creditors, and that negotiations with this object continued until Feb. 29th. It is true, that such negotiations were in progress until that day, but so soon as it was discovered that they would not succeed, the parties immediately filed their petitions to be adjudged bankrupt; and I cannot doubt, that during the entire negotiations, it was the purpose of the parties to avail themselves of the bankrupt act, if they did not effect a settlement. If any doubt however existed on this point, it is beyond dispute, the parties were then deeply insolvent, and in that condition these proceedings with the claim against Caleb Leavitt were in fraud of the law, and such as must debar the bankrupt of his discharge, the same as if they had been done in contemplation of bankruptcy, and an amendment of the specifications to this extent, would not be unreasonable.

The bankrupt claims, that the property thus converted by him to his own use was his individual estate and not partnership assets, and however fraudulent his conduct and dealings with it may have been, the objecting creditors cannot avail themselves of it, as they are partnership and not individual creditors; that the latter only can object on this ground to his discharge, as they are alone injured and defrauded.

In the first place, it appears that nearly $200 of this amount was originally due to the firm from Caleb Leavitt, and of this sum, by these proceedings, the firm creditors have certainly been defrauded. Secondly, there is no evidence before me that there existed any individual liabilities of this bankrupt, and if he was not thus indebted, his firm creditors were entitled to the benefit of this claim. So that, without further answers to the objection which could be suggested, I am quite clear on the proof, that the creditors now present have a right to insist on their objection to his discharge, notwithstanding they are co-partnership and not individual creditors.

For thus attempting to appropriate and absorb so large a portion of his estate, after he had become notoriously insolvent, this bankrupt must be denied his discharge; and I shall not hesitate, whilst I am called upon to administer the bankrupt law, so to determine in all attempts as flagrant as the present appears to be to me. Such persons will find, when they have become insolvent, that it will not prove for their benefit and advantage to devote their whole attention to the provisions of the exemption laws of the state, and to ascertaining in what way they may contrive to keep the remnants of their property, and still avail themselves of the benefits of the bankrupt act. On the contrary. it should occur to the bankrupts that their creditors have still certain claims

and rights, and that in granting them so great a boon as an absolute release from all their liabilities, the law in turn demands of them to surrender to their assignee their estate without any fraudulent diminutions, trusting to the discretion and liberality of the assignee and the court to make them such further allowances beyond the property already fairly exempted to them under the state law, as in their peculiar circumstances, they shall be found entitled to under the liberal provisions of the bankrupt law. By endeavoring to grasp the whole estate they may fail to obtain the greater prize, their discharge. Discharge denied.